UNPUBLISHED ORDER
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued August 2, 2005
Decided November 17, 2005

**Before**

Hon. JOHN L. COFFEY, *Circuit Judge*

Hon. DANIEL A. MANION, *Circuit Judge*

Hon. ILANA DIAMOND ROVNER, *Circuit Judge*

No. 04-3617

SCOTT MANLEY,
    *Plaintiff-Appellant*,

    *v.*

JO ANNE BARNHART,
    *Defendant-Appellee.*

Appeal from the United States District
Court for the Eastern District of
Wisconsin

No. 03-C-337

Rudolph T. Randa,
*Chief Judge.*

**O R D E R**

Scott Manley, who suffers from Chronic Fatigue Syndrome (CFS), applied to the Social Security Administration for disability insurance benefits. His claim was denied and his appeal to an Administrative Law Judge (ALJ) was unsuccessful, who concluded that Manley was able to work in the national economy. The appeals council denied Manley's request for review and the district court upheld the ALJ's decision. We affirm.

At a hearing before the ALJ, Manley testified as follows. In 1996, he began receiving treatment for viral meningeal encephalitis[1], and in early 1997 he suffered

---

[1]"An inflammation of the brain and its membranes" that is caused by a virus.

(continued...)

a grand mal seizure.  Several months later, in June 1997, he underwent open-heart surgery focusing on an aortic valve replacement.  He believes that these ordeals led soon thereafter to an onslaught of symptoms—headaches, dizziness, lightheadedness, confusion, difficulty with balance, and persistent fatigue—that were ultimately diagnosed as CFS.  These symptoms interfered with his work as an assembler of pool and spa pumps; he became unsteady on his feet, so his employer created a sedentary position for him scheduling orders on a computer.  But even this proved too much.  Manley's health problems caused him to miss work for weeks at a time, and on occasion he needed a family member to drive him home after only a few hours on the job.  By October 1999, he could persevere no longer and he stopped working altogether.

Manley's daily activities are now more constricted.  He reads the Bible and Sports Illustrated magazine, and watches the news on television, but has difficulty focusing and so usually abandons these activities after short periods.  He watches over the family's dogs, collects and sorts the mail, washes the dishes, and occasionally does laundry.  On the advice of his physicians, he leaves the house for short walks of fifteen to twenty minutes several times a week, but says that this activity always leaves him drained and he is required to rest or sleep for several hours afterward.  From time to time, Manley drives to his parents' house for lunch, and frequently accompanies his wife to church on Sundays.

A number of physicians have examined Manley—many of them upon referral from his general practitioner, Dr. Britton Kolar—drawing various conclusions as to the cause and severity of his symptoms.  Dr. Robert Henderson, a cardiologist, treated Manley for a severe headache and unexplained vision loss in February 1998, and noted that these problems had "[c]leared completely," that Manley's "cardiac exam was unremarkable, except for his cardiovascular examination," and that a slight abnormality in his EEG was neither a "significant or diagnostic" problem.  Dr. Henderson again treated Manley in December and stated, "I am not sure what this symptom of lightheadedness is, but I think it is clearly non-cardiac." He opined that it was probably caused by a reaction to Dilantin, a drug used to control seizures.

Dr. Stanley Boyer, a neurologist, treated Manley from May 1998 to June 1999.  He described Manley's symptoms of dizziness, lightheadedness, imbalance, and disequilibrium as "rather vague and non-specific," and found no explanation for them.  Like Dr. Henderson, Dr. Boyer believed that Manley's problems were caused by a reaction to Dilantin; Manley was "much improved" after discontinuing his use

---

[1](...continued)
Stedman's Medical Dictionary 1091 (27th ed. 2000).

of the drug. Dr. Boyer ran a series of tests—MRIs, an EEG, a brainstem auditory evoked response test, blood cultures, and a chemistry panel—all of which came back normal. In May 1999, Dr. Boyer responded to Manley's questions about returning to work, saying that he did not think "there would be any harm from him going back to work if he can tolerate it." In June 1999, Dr. Boyer stated, "I do not have any other useful suggestions at this time."

Next Manley visited Dr. Brad Beinlich, another neurologist. In December 1999, Dr. Beinlich noted that the "etiology" of Manley's symptoms was "unclear," and recommended that his doctors "continue with treatment focused on depression and anxiety." In March 2000, Dr. Beinlich stated that Manley appeared "very pleasant," and was "in no apparent distress." He noted "some mental fatigue as well as mild to moderate depression," concluding that Manley's symptoms "fall[ ] within the range of chronic fatigue syndrome."

Dr. Beinlich referred Manley to Dr. Jerry Halsten for a neuropsychological evaluation in February 2000. Dr. Halsten administered a series of physical, cognitive, and psychological tests and determined that Manley's "current estimated general intellectual functioning is within the Average range"; that he did "not display a decline in global cognitive functioning relative to his intellectual ability" but did have a "slight decrease" in "mental efficiency that is entirely consistent with his history of coronary problems"; and that he exhibited "mild to moderate symptoms of depression." Dr. Halsten observed that Manley "has clearly experienced rapid fatigue in the work environment," and was "likely to experience significant mental fatigue if he works shifts exceeding eight hours or he works nighttime or early morning hours."

In April 2000, Manley visited Dr. Robert Gordon for a psychological evaluation. Dr. Gordon concluded that Manley "can be diagnosed as having an adjustment disorder with mixed emotional features. It is judged that he is capable of independently managing any benefits that might be granted to him."

Meanwhile Dr. Kolar, Manley's general practitioner, continued to treat him for fatigue and cardiac irregularities throughout this period. In February 2000, he noted Manley's complaints of "increased cardiac irregularity and rapid pulse," but stated that "[h]e appeared very compensated and had no significant complaints." He stated that Manley's "chronic fatigue syndrome" was "ongoing with [a] profound impact on [his] daily life." In June 2000, Dr. Kolar completed a "Physician's Statement of Disability" form, listing diagnoses of "viral meningoencephalitis with multiple somatic complaints & chronic fatigue," but concluding that his "etiology remains obscure." He checked boxes indicating that Manley could not walk for more than a total of two-and-a-half hours per day, stand more than two hours, or sit more than five-and-a-half hours; rated Manley with a class two "slight" cardiac

limitation; and opined that he should be limited to sedentary work. In noting Manley's attempts to maintain a normal lifestyle in April 2001, Dr. Kolar reported that "he cannot be up for more than one hour at a time without overwhelming fatigue. This requires that he either rest or sleep." In June 2001, Dr. Kolar stated that Manley was "much the same with his usual fatigue precluding regular activity." He noted Manley's "perception of increasing cardiac irregularity," but stated that his "[v]alve sounds are clear. There is no obvious diastolic murmur audible. . . . Peripheral pulses are intact."

Manley visited an endocrinologist, Dr. Richard Weirich, in July and August 2000. In July Dr. Weirich stated that Manley was "in no acute distress," and performed a cardiac exam, "which reveal[ed] a regular rate and rhythm without extra heart sounds or congestive heart failure signs." Dr. Weirich ruled out endocrinopathy and stated that his primary concern was pituitary disfunction. But a battery of tests came back with unremarkable results, and Dr. Weirich concluded that the "lack of true symptoms and signs that could be identified by physical examination lead me at this point . . . to stop further workup." He said that Manley's personal treating physician should continue to treat for "potential chronic fatigue syndrome" or fibromyalgia, and made "a strong recommendation for the patient to return to work as soon as possible despite ongoing symptoms."

Finally, Manley's file was evaluated by two state physicians and two state psychologists in conjunction with his application for disability benefits. In April 2000, the first state physician noted Manley's aortic valve replacement, his history of meningitis, and his chronic fatigue, and concluded that Manley could lift fifty pounds occasionally and twenty-five pounds frequently; could stand or walk six hours in an eight-hour workday; and could sit for six hours in a normal workday. The first psychologist stated that Manley had "[a]djustment disorder with mixed emotional features," and noted his diminished appetite, difficulty sleeping, and decreased energy. The psychologist concluded that Manley had "slight" limitations on his daily activities, his ability to maintain social functioning, and his difficulties with concentration, persistence, and pace. In September 2000, the second state physician's conclusions mirrored the earlier report, except for stating that Manley could lift only twenty pounds occasionally and ten pounds frequently. The physician noted that the "[l]imitations described above result from complaints of fatigue given physical exams & lab studies WNL [within normal limits]." The second psychologist's report is identical to the first, except for noting that Manley's symptoms were "compatible with chronic fatigue syndrome."

The ALJ denied the application, finding that Manley had failed to demonstrate that he was disabled under the Social Security Act. Applying the five-step analysis set out in 20 C.F.R. §§ 404.1520 and 416.920, the ALJ in July 2001 found that Manley (1) has not engaged in gainful activity since October 15, 1999;

(2) has a severe impairment that (3) does not meet a listing in the appendix to the Social Security regulations; (4) could not perform his past relevant work; but (5) retains the residual functional capacity (RFC) to perform other work. In reaching this conclusion, the ALJ placed less than controlling weight on his personal physician's findings because they were based on Manley's subjective complaints rather than objective evidence, and were "internally inconsistent" regarding Manley's heart condition. Also, the ALJ relied on the testimony of a vocational expert (VE) in concluding that there are jobs in the national economy that accommodate Manley's limitations. The ALJ also found that Manley's "complaints and allegations about his limitations and impairments are not fully credible," noting inconsistencies between his activity level and his statements to doctors. The district court affirmed, finding that substantial evidence supports the ALJ's decision.

This court must also affirm the ALJ's decision if it is supported by substantial evidence that a reasonable mind could accept as adequate. *Sienkiewicz v. Barnhart*, 409 F.3d 798, 802 (7th Cir. 2005). This standard of review is limited; we will not substitute our judgment for the ALJ's by reconsidering facts, reweighing evidence, or deciding questions of credibility. *Id.*

On appeal Manley initially challenges the ALJ's RFC finding, specifically the decision to give less than controlling weight to the assessment of treating physician Dr. Kolar. Manley disagrees that Dr. Kolar's assessment was based on subjective complaints rather than objective evidence, contending that a patient's complaints are a permissible grounds for diagnoses in CFS cases. The opinions of treating physicians such as Dr. Kolar are accorded controlling weight, but not if they are inconsistent with the other objective evidence in the record, such as the findings of other examining physicians. *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005); 20 C.F.R. § 404.1527(d)(2), (5). Moreover, courts have cautioned that claims of disability based on amorphous pain disorders such as CFS and fibromyalgia often must center around the subjective complaints of the patient, since they have few objective indicators. *See Mastro v. Apfel*, 270 F.3d 171, 176–77 (4th Cir. 2001); *Sarchet v. Chater*, 78 F.3d 305, 306–07 (7th Cir. 1996). But the severity of these disorders varies, and the claimant's subjective complaints need not be accepted insofar as they clash with other evidence in the record. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001); *see also Carradine v. Barnhart*, 360 F.3d 751, 764 (7th Cir. 2004) (Coffey, J., dissenting) (noting that "rely[ing] solely on a claimant's subjective testimony . . . possesses a greater potential for manipulation because outward manifestations of pain can easily be contrived by a calculating claimant") (internal quotation marks ommitted).

Here the ALJ permissibly disfavored Dr. Kolar's findings because they conflict with substantial objective evidence in the form of the assessments of other

examining and treating physicians. *See Carradine*, 360 F.3d at 773 (Coffey, J., dissenting) (quoting Social Security Ruling 96–7p) (stressing the importance of the "consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities"). No other physician placed such restrictive limits on Manley's ability to function on a daily basis, and three of them—Drs. Gordon, Halsten, and Weirich—suggested or stated outright that he was capable of working for extended periods of time, with Dr. Weirich even giving a "strong recommendation" that he return to work. In contrast, Dr. Kolar's reports often give the impression of simply recording Manley's complaints, calling into question the objective basis for his conclusions. *See White*, 415 F.3d at 659. While another factfinder might nonetheless be tempted to side with Dr. Kolar for his greater familiarity with Manley's case, this court has previously noted the possibility that a treating physician may be biased to help a friend and patient. *See Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). Substantial evidence supports the ALJ's decision to place less weight on Dr. Kolar's findings.[2]

In a poorly developed follow-up argument, Manley contends that even if the ALJ permissibly disfavored Dr. Kolar's more sympathetic opinion, the ALJ failed to state what weight he accorded it. This argument also fails. We can find no case holding that an ALJ who explains the basis for disfavoring a treating physician's opinion must also state precisely how much weight—beyond "not controlling"—he places on it. *Compare Langley v. Barnhart*, 373 F.3d 1116, 1122–23 (10th Cir. 2004) (reversing ALJ for placing less weight on treating physician where ALJ failed adequately to explain decision); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544–46 (6th Cir. 2004) (same); *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003) (same), *with Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004) (affirming placement of less weight on treating physician because ALJ provided sufficient reasons for decision, even though he did not describe how much weight it received).

Next Manley challenges the hypothetical the ALJ posed to the vocational expert, contending that it was incomplete because rather than stating that the hypothetical individual must be able to alternate between standing and sitting "at will," the ALJ merely said that the individual "[c]ould alternate" between standing

---

[2]The same logic dooms Manley's challenge to the ALJ's decision to exclude from the RFC finding a discussion of Manley's inability to work on a sustained basis. Although Manley consistently complained of the need to sleep frequently and rest after activity, none of the examining physicians prescribed such limitations except Dr. Kolar, who acknowledged Manley's complaints rather than stating that such restrictions were necessary.

and sitting "throughout an eight-hour day," after stating that he "could only sit up to one hour at a time or stand up to one our at a time."

Although we agree that the hypothetical could have been more precisely worded, we disagree that this was fatal. We have repeatedly held that a hypothetical is not defective simply for failing to include each and every detail of the applicant's disability, provided there are indications that the VE reviewed the entire record prior to the hearing. *Ragsdale v. Shalala*, 53 F.3d 816, 820 (7th Cir. 1995); *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992). Here, the distinction between "alternate at will" and "alternate throughout the day" is subtle to begin with, but any ambiguity is resolved by the VE's assertion that he had reviewed the entire record and listened to the Manleys' testimony. *See* Tr. at 58–59. We did limit the *Ehrhart* principle somewhat in *Young v. Barnhart*, 362 F.3d 995, 1003–04 (7th Cir. 2004), stating that relying on the VE's familiarity with the record may be inappropriate when the ALJ asks multiple fact-sensitive hypotheticals that rule out key disability factors. Here, the ALJ did ask several hypothetical questions with varying disability limitations. But it is not the case that some hypotheticals allowed Manley to alternate between sitting or standing at will while others required him to sit or stand for an hour at a time. Thus nothing would keep the VE in interpreting the ALJ's hypothetical from considering Manley's earlier statements that he could only stand or sit for very limited stretches.

Manley raises two other challenges to the ALJ's hypothetical question, and to the VE's testimony, but he has forfeited both arguments. He first contends that the hypothetical was also incomplete because it made no mention of his mental limitations, but he failed to raise this issue before the district court. *See Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). Second, he argues that the ALJ impermissibly neglected to ask the VE whether his conclusion that Manley could still perform many jobs in the national economy conflicts with the *Dictionary of Occupational Titles*, but he didn't challenge the VE on this point during his cross-examination, relieving the ALJ of any obligation to ask. *See Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004); *Donahue v. Barnhart*, 279 F.3d 441, 446–47 (7th Cir. 2002); *cf. McKinnie v. Barnhart*, 368 F.3d 907, 910–11 (7th Cir. 2004).

Finally, Manley challenges the ALJ's adverse credibility determination, contending that it is incomplete and at times wrong. It is true that the credibility finding may not be supported by substantial evidence. The government concedes that the ALJ erred in one of his reasons for discrediting Manley: the incorrect observation that Manley kept working beyond the date on which he allegedly became disabled. And the other major reason—a perceived inconsistency because Manley's testimony suggests his symptoms worsened over the summer of 2000 even though he stated to doctors that his condition was unchanged—is also shaky, for

Manley *did* tell Dr. Kolar in June 2000 that he had experienced "a decrease in his physical activity." However, because the ALJ relied very little on the credibility finding in determining that Manley was not disabled—weighing instead the many doctor's reports in the record—these errors are harmless. *See Frank v. Barnhart*, 326 F.3d 618, 621–22 (5th Cir. 2003).

For the foregoing reasons, we AFFIRM the judgment of the district court.