# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 04-1542

LYNNE A. SIENKIEWICZ,

*Plaintiff-Appellant*,

v.

JO ANNE B. BARNHART, Commissioner
of Social Security,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 02 C 6332—**Wayne R. Andersen**, *Judge.*

_____

ARGUED NOVEMBER 17, 2004—DECIDED JANUARY 6, 2005
PUBLISHED MAY 31, 2005[1]

_____

Before COFFEY, MANION, and ROVNER, *Circuit Judges.*

PER CURIAM. Lynne Sienkiewicz applied for disability
insurance benefits (DIB) and Supplemental Security Income

_____

[1] This decision was originally issued as an unpublished order.
The defendant has since filed a motion requesting publication. *See*
Cir. R. 58(d)(3). The panel has granted that motion and now
reissues its decision as a published opinion.

(SSI) benefits in 1999, claiming that a host of ailments had rendered her disabled since 1993. At a hearing in February 2001, an Administrative Law Judge (ALJ) found that Sienkiewicz was not disabled. The Appeals Council declined review and the district court affirmed. Sienkiewicz now appeals. Because the ALJ's decision is supported by substantial evidence, we affirm.

## I. FACTS

The ALJ found that Sienkiewicz suffers from a wide variety of ailments, specifically: (1) asthma, (2) lower back pain, (3) degenerative disease of the right knee, (4) abdominal pain, (5) chest wall pain, (6) morbid obesity (she is 5′6″ and weighs 290 pounds), (7) plantar fascitis, (8) migraine headaches, (9) depression, and (10) anxiety. Sienkiewicz also testified that she suffers from a number of other conditions. The ALJ found her to be not entirely credible.

Sienkiewicz, who was 35 years old at the time of the hearing and has a high school education, testified that she last worked in 1993 as a nanny. Previously, she worked from 1986 until 1990 as an egg candler, which involves sitting by a conveyor belt and inspecting eggs as they pass by. Sienkiewicz said she stopped working because of pain in her knees. She subsequently applied for several jobs as either a nanny or a secretary, but later withdrew all of her applications after deciding that the positions would be too demanding.

Sienkiewicz testified that she suffers from a number of medical conditions. According to her testimony, she has suffered since 1996 from severe headaches that require her to lay down for 15 minutes to one hour between once a month and twice a week. She also testified that since 1998 she has had problems with her right knee locking—a painful

condition that makes it difficult for her to walk. Additionally, she developed pain in her right heel in mid-2000 that causes her to walk with a limp. Sienkiewicz also claimed that she was diagnosed in 1998 with a possible ulcer that causes a painful burning sensation in her stomach between one and three times per week. She testified that she has suffered from depression since 1995. Beginning in 2000, her depression worsened and she began to suffer crying spells that keep her from leaving the house a "couple times a week." She later began having mood swings and experiencing anxiety in large crowds. She also testified that she suffers from asthma and that she sometimes has difficult breathing when she feels anxious.

At the time of her administrative hearing, Sienkiewicz was under the care of two doctors and she received treatment for one condition or another approximately once every other week. She saw her family physician for her anxiety and stomach pain and an orthopedist for her foot and knee problems. Sienkiewicz also testified that she was taking 13 prescribed medications at the time of the hearing. She submitted records from a pharmacy, but those records do not show when the various drugs were prescribed or the duration of the prescriptions. She also testified that she could comfortably stand for 20 to 30 minutes at a time and comfortably sit for 40 consecutive minutes before her right knee became sore.

Despite the numerous serious conditions Sienkiewicz described in her testimony, her medical records show that she never sought treatment for any of them until July 1999, when she saw Dr. Pales,[2] an orthopedist, about pain in her

---

[2] Sienkiewicz's medical records refer to a Dr. Lim as well as Dr. Pales, and it is unclear whether she was treated by one or the
(continued...)

right leg. She had one follow-up visit in 1999 with Dr. Pales, who recommended rest, heat, and massage, and prescribed medicine for her pain. Dr. Pales saw Sienkiewicz again in September 2000, and gave her an injection to control the pain in her foot. The medication was effective, but Sienkiewicz returned in November and January for additional injections because the pain had returned. Dr. Pales suggested that she consider surgery or ultrasonic treatment if she continued to experience pain.

In January 2000, Sienkiewicz, complaining of chest pain, shortness of breath, weakness, and back and leg pain, sought treatment at an urgent care center from Dr. Figueroa. The doctor prescribed medication and scheduled a follow-up appointment. But notes of a phone call two weeks later show that all of Sienkiewicz's tests came back normal, and that the doctor cancelled the follow-up appointment.

After she filed for disability benefits, Sienkiewicz was examined by two physicians selected by the Illinois Bureau of Disability Determination Services. Dr. Kale diagnosed Sienkiewicz with obesity, depression, and anxiety. He also noted that she reported a history of asthma, headaches (which she said were controlled with ibuprofen), and pain in her right leg. Dr. Kale saw no evidence of asthma and no abnormalities in her leg. Dr. Nelson, a psychiatrist, diagnosed Sienkiewicz with moderate dysthymia disorder—a form of depression—and concluded that her condition had deteriorated over the past 18 months, resulting in increased levels of anxiety and social withdrawal. Two other physicians also reviewed Sienkiewicz's medical records. Dr. Hermsmeyer,

---

[2] (...continued)
other or by both. Although the notations in her chart appear to have been made by Dr. Lim, Sienkiewicz's brief says that she was treated only by Dr. Pales, and we accept her representation.

a psychiatrist, found that she had an affective disorder that caused slight restrictions in activities of daily living and slight difficulties in social functioning, but seldom caused deficiencies in concentration, persistence, or pace. Dr. Irahad opined that Sienkiewicz could lift 20 pounds occasionally and 10 pounds frequently; could stand or sit for six hours in an eight-hour day; and should avoid concentrated exposure to respiratory irritants and extreme temperatures.

In January 2000, Sienkiewicz was evaluated by two more doctors for purposes of reviewing her disability claim. Dr. Epner, an internal medicine specialist, diagnosed her as having asthma, a decreased range of motion in her back, swelling in her right knee, and tenderness in her abdomen. He also noted that Sienkiewicz was obese, walked with a slight limp, and reported histories of headaches, asthma, and anxiety. Dr. Conran, a psychiatrist, diagnosed her with moderate depression. Two additional consulting physicians, Drs. Kim and Singh, reviewed Sienkiewicz's records, and they reached substantially the same conclusions as Drs. Hermsmeyer and Irahad.

A vocational expert (VE) testified that Sienkiewicz's work as a nanny was light to medium and semi-skilled. Her job as an egg candler was sedentary to light and unskilled. In response to a hypothetical question from the ALJ, the VE testified that someone with a high school education who, among other things could sit, stand, or walk for only six hours in an eight-hour day with normal breaks and could have only incidental contact with the general public could not be a nanny but could work as an egg candler. If that person was further limited to standing and walking for two hours in an eight-hour day and no more than 15 minutes continuously, she could no longer work as an egg candler. However, such a person could work as a hand packager (2,000 jobs in the Chicagoland area), production inspector

(1,000 jobs), or assembler (4,500 jobs). If the person was further limited to sitting for 45 minutes followed by a 1-2 minute break, only 1,000 hand packager jobs would remain. Finally, if the person was required to take two unscheduled one-hour breaks per week, she would be unemployable.

The ALJ evaluated Sienkiewicz's claim of disability using the standard five-step analysis. *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At Steps 1 and 2, the ALJ determined that Sienkiewicz was not engaged in substantial gainful activity and that her impairments were "severe." But he found at Step 3 that her impairments neither met nor exceeded the level of severity required by the listings. *See* 20 C.F.R. Part 404, Subpart P, App. 1. At Step 4, he determined that Sienkiewicz was unable to perform her past relevant work, but concluded at Step 5 that she could perform sedentary unskilled jobs existing in significant numbers in the regional economy. *See Dixon*, 270 F.3d at 1176; 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Accordingly, the ALJ found her not disabled.

## II. ANALYSIS

We review an ALJ's decision that an applicant is not disabled for substantial evidence. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). We review the record as a whole, but do not reweigh evidence or substitute our judgment for that of the ALJ. *Id.*

We begin with Sienkiewicz's argument that the ALJ erred when he denied her DIB. This claim is easily resolved because Sienkiewicz presented no evidence at all addressing her medical condition prior to 1998. The ALJ found—and Sienkiewicz does not dispute—that her insured status for purposes of the disability insurance program ended in June 1995. *See* 42 U.S.C. § 423(a)(1)(A). Because Sienkiewicz

offered no evidence to show that she was disabled during the insured period, the ALJ did not err in denying her application for DIB. *See Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). That leaves her claim for SSI benefits. An applicant who cannot establish that she was disabled during the insured period for DIB may still receive SSI benefits if she can establish that she is disabled and has limited means. 42 U.S.C. §§ 1381a, 1382; *see also Splude v. Apfel*, 165 F.3d 85, 87 (1st Cir. 1999) (discussing difference between DIB and SSI benefits). Sienkiewicz contends that the ALJ committed several errors at both Step 3 and Step 5 in finding her not disabled.

Sienkiewicz argues generally that the ALJ failed at Step 3 to address whether the combination of her impairments—specifically the impact of her obesity—met or exceeded a listed impairment. *See* 20 C.F.R. Part 404, Subpart P, App. 1. When an applicant has several medical problems, the ALJ must consider her condition as a whole. *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004). In particular, an applicant's obesity must be considered in combination with her other impairments. *See Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000); SSR 00-3p at *6 (2000); *see also* SSR 02-1p (2002).

The ALJ properly found that Sienkiewicz's impairments did not satisfy the Step 3 criteria. Sienkiewicz claims that her obesity may increase the severity of her musculoskeletal and pulmonary disorders. *See* 20 C.F.R. Part 404, Subpart P, App. 1 § 1.00(Q) (obesity may aggravate musculoskeletal condition); *id.* § 3.00(I) (obesity may aggravate pulmonary condition). But the ALJ found that Sienkiewicz was obese and nothing suggests that he then disregarded that finding when evaluating whether her various medical conditions met the severity of the listed impairments. Even with her obesity, the ALJ found that Sienkiewicz walked with only a

"slight limp." The listings for musculoskeletal impairments require that an applicant demonstrate an "extreme limitation on the ability to walk," 20 C.F.R. Part 404, Subpart P, App. 1 § 1.00(B)(2)(b)(1), and the ALJ's factual finding that Sienkiewicz walked with only a slight limp—a finding she does not contest—falls well short of that standard. Likewise, Sienkiewicz argues that she has asthma and that her obesity aggravates that condition. But although the ALJ accepted her contention that she has asthma, he observed that none of the doctors who examined Sienkiewicz detected any symptoms of asthma, and that her scores on a pulmonary function test showed that her lungs were significantly less obstructed than required to meet the severity of the listings. *See* 20 C.F.R. Part 404, Subpart P, App. 1 § 3.02. These medical records provide substantial evidence for the ALJ's finding that, even with her obesity, Sienkiewicz's asthma was not equal in severity to a listed impairment.

Sienkiewicz makes a similar argument that the ALJ's residual-functional-capacity finding at Step 5 failed to account properly for her obesity because she claims the ALJ did not consider her testimony that she could sit for only 40 minutes at a time, and instead found that she could sit for six hours in an eight-hour workday with normal breaks. Again, an ALJ must consider the effect of an applicant's obesity in conjunction with her other impairments. *See Clifford*, 227 F.3d at 873. In his decision, the ALJ found that morbid obesity was one of Sienkiewicz's medically determinable impairments, and he specifically mentioned her testimony that she could sit for no more than 40 minutes continuously. But as the ALJ observed, both of the consulting physicians who reviewed Sienkiewicz's records opined that she could meet the requirements of light work by sitting for six hours in an eight-hour day, and no doctor ever suggested that any greater limitation was required. *Cf. Barrett*,

355 F.3d at 1068 ("And in particular . . . we do not know on what basis [the ALJ] decided that Barrett can stand for two hours at a time."). Furthermore the VE testified that Sienkiewicz would still be able to work as a hand packager even if she had to take a brief break from sitting every 45 minutes (neither party asked the VE about a limitation of 40 minutes). Thus the ALJ's finding concerning Sienkiewicz's ability to sit continuously is supported by substantial evidence.

Sienkiewicz next argues that the ALJ erred by failing at Step 5 to consider her testimony that her stomach pain, depression, headaches, and panic attacks collectively cause symptoms that would force her to take several unscheduled breaks per week. Because—as the VE testified—two unscheduled one-hour breaks per week would make her unemployable, Sienkiewicz argues that she should be considered disabled. Sienkiewicz testified that at the time of the hearing she experienced headaches lasting up to one hour as often as twice per week, panic attacks lasting up to an hour as often as two to three times per week, abdominal pain of unspecified duration approximately three times per week, and episodes of depression a "couple times a week."

The ALJ found Sienkiewicz's testimony about the extent of her ailments to be not completely credible. We must determine whether that finding was supported by the record, recognizing that the credibility determinations of an ALJ are entitled to "special deference." *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). The ALJ here adequately explained his credibility finding. He noted that Sienkiewicz's complaints of extreme pain were inconsistent with the findings of all the doctors who examined her and opined that she had only minimal or moderate limitations. *See Jens*, 347 F.3d at 213-14; *Dixon*, 270 F.3d at 1179; *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *see also* SSR 96-7p at *3 (1996).

The ALJ observed that Sienkiewicz's treatment had been "routine and conservative" in that she sought medical treatment only seven times in the eight years she claims to have been totally disabled. Specifically, she never sought treatment for her headaches despite her complaints about their severity, and never saw a mental health care specialist about her depression. This repeated failure by Sienkiewicz to seek medical treatment provides support for the ALJ's credibility finding. Because the ALJ found Sienkiewicz not entirely credible, he was not required to accept in its entirety her testimony about her potential need for unscheduled breaks.

Finally, Sienkiewicz argues that the ALJ failed to consider her headaches in evaluating her claim of disability. The ALJ noted Sienkiewicz's testimony concerning the headaches, but also observed that she had never sought any treatment for them, and that none of the doctors who examined her imposed any specific limitations on her activities because of the headaches. An ALJ may not disregard an applicant's subjective complaints of pain simply because they are not fully supported by objective medical evidence. *See Clifford*, 227 F.3d at 871. But a discrepancy between the degree of pain claimed by the applicant and that suggested by medical records is probative of exaggeration. *See Powers*, 207 F.3d at 435-36. Sienkiewicz's testimony of extreme limitations because of her headaches is inconsistent with the reports she gave to the various physicians who examined her, and the record does not show a single instance in which she sought treatment for her headaches. Accordingly, the ALJ's finding is supported by substantial evidence.

### III. CONCLUSION

The ALJ's denial of Sienkiewicz's application for both DIB and SSI benefits is supported by substantial evidence.

AFFIRMED.

No. 04-1542                                        11

A true Copy:

     Teste:


                          _____
                          *Clerk of the United States Court of*
                          *Appeals for the Seventh Circuit*