**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued August 2, 2005
Decided September 20, 2005

**Before**

Hon. JOHN L. COFFEY, *Circuit Judge*

Hon. DANIEL A. MANION, *Circuit Judge*

Hon. ILANA DIAMOND ROVNER, *Circuit Judge*

No. 05-1735

| | |
|---|---|
| SHARON DEVITT, | Appeal from the United States |
| *Plaintiff-Appellant,* | District Court for the Eastern District of Wisconsin |
| *v.* | |
| | No. 04-C-147 |
| JO ANNE B. BARNHART, | |
| Commissioner of Social Security, | J.P. Stadtmueller, |
| *Defendant-Appellee.* | *Judge.* |

**O R D E R**

Sharon Devitt applied for Social Security Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), claiming that she could not work due to fibromyalgia, kidney pain, a shoulder injury, and a mental disorder, among other things.  Applying the five-step analysis, an Administrative Law Judge (ALJ) found her not disabled because she could return to past relevant work or, alternatively, because she could perform a significant number of jobs near her home town of Milwaukee.  Devitt sought review in the district court, which affirmed.  Devitt's arguments on appeal are essentially fact-bound.  The ALJ's decision is legally correct and supported by substantial evidence.  We therefore affirm the district court.

Devitt, who has bachelor's and master's degrees, was 46 years old when the ALJ issued his decision. During the fifteen years before her alleged disability, she worked as a telephone authorization supervisor and credit analyst for a credit card company. She also worked for the Wisconsin Department of Transportation, conducting road tests until 1994. At that point, a shoulder injury limited her to administering vision tests, issuing documents, and entering data. She alleges that on February 24, 2000, she could no longer work due to disability. Her date of last insured was December 2004.

Apparently obese at five feet four inches and 215 pounds, Devitt claims to have various ailments including fibromyalgia, kidney pain (which she also calls "flank pain"), a shoulder injury, and a mental disorder. She was treated for these conditions by her primary caregiver, Dr. Watt. She met with him at least a dozen times before her February 2000 onset date and about six or seven times afterward. In addition to his own diagnoses and treatment, Dr. Watt also coordinated referrals with various specialists.

Devitt's fibromyalgia—marked by pain and tenderness at multiple points on the body—was first diagnosed by rheumatologist Dr. Hinkle in 1999. He based his diagnosis on "pressured speech," tender hand and foot joints, and tender muscle points (symptoms "reasonably consistent with early osteoarthritis"). During several visits over six months, Dr. Hinkle prescribed Vioxx and Relafen.

Devitt's kidneys began troubling her in 1998, when she had a stone that required lithotripsy (crushing the stone with sound waves) and stents (to keep open the urinary tract). That treatment left her incontinent for a time, and she still has some partial incontinence and urinary urgency. During 1998 to 2000 she saw a nephrologist, Dr. Sievers, complaining of flank pain. He opined that the pain might be caused by microcrystallization or a chemical imbalance in her urine.

The left shoulder injury happened on the job in 1994 during a slip and fall. In 2000 Dr. Watt and several other physicians conducting disability evaluations noted the injury, calling it variously a "rotator cuff irritation," "shoulder impingement with myofacial pain," or "shoulder sublaxation and brachial plexus injury." Some characterized it as "mild," but the reports agree it limited her from lifting more than ten pounds.

In December 2000 (ten months after the onset of her alleged disability) Devitt began seeing psychologist Dr. Rubin for bipolar disorder. Dr. Rubin completed a Mental Residual Functional Capacity (RFC) form, noting moderate limits on social interaction, complex instruction, and concentration—and marked limits on timeliness and endurance. Starting May 2001, a Dr. Houghton prescribed drugs for suicidal thoughts, sleep loss, and social problems.

Other evidence includes a report by Vance Masci, an M.D. with a master's degree in public health, who examined Devitt at her request in support of a disability claim. Based on her statements and records, he opined that she was "permanently and totally disabled" due to the shoulder injury, kidney problems, and fibromyalgia. Devitt also submitted chiropractors' notes from May 1999 to August 2000, recording complaints of pain. Last, a friend familiar with her daily activities stated via questionnaire that Devitt recently limited her household chores, needed help driving, curtailed social interactions, and required reminders to change clothes or brush her teeth.

SSA consulting physicians found only mild or moderate limitations. Doctors McDermott and Crennan wrote that according to the record Devitt's only limitation was an inability to lift over 10 or 20 pounds due to her shoulder injury. Dr. Wallskog, who examined Devitt, wrote that she complained of generalized pain and incontinence. Nevertheless, he concluded that in light of his observations regarding her mobility, the range of motion in her joints, her grip strength, and lack of muscle atrophy, she was exaggerating pain. Psychologist Roger Rattan also reviewed the record and found mild limitations on social functioning and concentration, noting sleep problems, weight loss, and symptoms of a depressive syndrome. Likewise, psychologist Robert Hodes commented on record evidence of non-severe affective disorders, and sleep and energy loss. Psychiatrist Phillip Ruppert examined Devitt, concluding that she "clearly demonstrates the cognitive capacity to understand, remember and carry out . . . complex job instructions."

After Devitt's claim was denied initially and upon reconsideration, she requested and received a hearing before the ALJ. She testified that fibromyalgia gave her pain in her arms, legs, buttocks, shoulders and neck, limited her sleep, caused her chronic fatigue and confusion, and circumscribed her ability to walk, do household chores, and run errands. She said that she could not stand for more than 10 to 15 minutes, could barely carry a gallon of milk, and could not walk more than a block. She added that kidney pain contributed to these limitations as did her shoulder injury, which kept her from lifting over ten pounds. To treat shoulder pain, Devitt used a transcutaneous electrical nerve stimulation (TENS) device. She was partially incontinent from kidney treatments and suffered from suicidal tendencies, depression, and crying spells. Additionally, she testified to a recently developed swelling in her extremities that might be caused by her thyroid. She listed her medications: lithium for mental disorders, arthritis-strength Tylenol for kidney pain, diuretics for her thyroid, and Vioxx and Relafan for fibromyalgia and osteoarthritis (though she discontinued these last two because they aggravated an irritable bowel syndrome).

During the hearing the ALJ also heard from psychologist Kerry Hamsher for the SSA. Hamsher concluded that although Devitt's treating doctor diagnosed bipolar disorder, the record better supported a diagnosis of a more general, less

severe affective disorder.  Dr. Hamsher relied on the record and Dr. Ruppert's psychiatric report explaining that any impairment only mildly reduced activities, energy level, and concentration.  He reported that she might have difficulty with complex instructions but nothing else.

Finally, the ALJ heard testimony from a vocational expert, who said that Devitt, based on her own description of her past work, could do her clerical jobs at the Wisconsin Department of Transportation or at the credit card company.  That is, she could perform those jobs—assuming mild difficulties in functioning socially and concentrating for long periods—if she did not have to lift over 10 pounds, stand more than two hours per day, sit more than six, or reach with her left hand.  Even with "moderate" social disability and limits on concentration, she could do 2,000 sedentary jobs near Milwaukee such as information clerk, parking lot attendant, or self-service gas station attendant.

Applying the familiar five-step analysis, *see* 20 C.F.R. §§ 404.1520, 416.920, the ALJ concluded that Devitt could perform her past relevant work and was therefore not disabled.  Alternatively, based on the VE's testimony, the ALJ decided that there were a significant number of other jobs in the Milwaukee area Devitt could still perform.  He also noted that at her relatively young age she could not be disabled under the Medical-Vocational Guidelines so long as she could still do some sedentary work and her condition did not meet or equal one of the Listings in the Appendix.  In so concluding, the ALJ assessed Devitt as retaining an RFC to do sedentary or light work provided:  1) it was unskilled or semiskilled without complex instructions or long periods of concentration, and 2) there was no prolonged standing or walking, lifting more than ten pounds, or reaching with the left hand.  And the ALJ partially discredited Devitt's accounts of pain and fatigue.  He based that credibility assessment on Dr. Hamsher's testimony as well as reports by SSA consultants and examiners, who thought she was exaggerating because they found no severe physical or mental impairments and because her muscle tone, mobility, and grip strength were fine.  Her medical records acknowledged her complaints of pain but contained little objective evidence of conditions that would cause severe pain.  The ALJ also thought it unlikely that her pain from fibromyalgia was as severe as she said, given that she saw a doctor for that condition for only six months and not since 2000.  The district court affirmed with "little trouble," concluding that the ALJ's RFC finding was supported by substantial evidence.

On appeal Devitt first contends that the ALJ failed to assess the credibility of her testimony about pain and fatigue by reference to factors in Social Security Ruling (SSR) 96-7p such as:  pain medication, other pain treatments, and daily activities.  She maintains, for instance, that the ALJ neglected to examine her circumscribed daily activities or consider that she was taking Vioxx and using a TENS device.  She also insists that he wrongly relied on an SSA doctor's opinion to discredit her when that doctor did not even mention her fibromyalgia.  Last, she

says that the ALJ erred by discounting her doctors' corroborating evidence based on speculation that she was "shopping" for physicians to attest to disability.

An ALJ who finds an impairment that may cause pain and fatigue must not ignore those subjective symptoms solely because they are unsupported by objective evidence. *Schmidt v. Barnhart*, 395 F.3d 737, 746–47 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 871–72 (7th Cir. 2000); 20 C.F.R. § 404.1529. This is because disabling pain oftentimes cannot be demonstrated objectively. *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). Therefore, the ALJ must evaluate testimony of those symptoms in light of the following factors: daily activities; duration, location, and frequency of pain; aggravating factors; medication; other treatments; and other relevant facts. *See Clifford*, 227 F.3d at 872; 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. Nonetheless, discrepancies between objective evidence and the degree of pain may help show exaggeration, *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005); *Powers v. Apfel*, 207 F.3d 431, 435–36 (7th Cir. 2000), as may a patient's choice to stop seeking treatment, *see Sienkiewicz*, 409 F.3d at 804; *Schmidt*, 395 F.3d at 747. In any event, we do not nitpick a credibility determination, *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004), and will overturn it only if patently wrong, *Schmidt*, 395 F.3d at 746–47.

Here, the ALJ supported his credibility determination with a reasoned discussion of the record in light of these rules. First, the ALJ considered discrepancies between objective evidence of Devitt's health (such as examining doctors' observations and medical records) and her symptoms. For example, the ALJ accepted the SSA examining doctor's conclusion that she was exaggerating pain and consequential limits on standing and mobility because her joints showed a good range of motion, her grip strength was fine, and her muscles were not atrophied. Even though the SSA doctor did not name fibromyalgia, the ALJ discussed it at length, noting properly that she had few records of tests or treatment. Next, he considered her treatments for pain. As for treatments for pain, the ALJ considered that Devitt saw a doctor for her fibromyalgia condition for only six months. If she stopped seeing the doctor, the ALJ could reasonably infer that she was not suffering as much as she said. What is more, contrary to Devitt's arguments, the ALJ did consider daily activities and factors aggravating pain (like lifting, standing, and walking), incorporating limitations in the RFC despite considerable doubts about the severity of pain.

Next, Devitt asserts that the ALJ failed to consider all her impairments and symptoms in combination—that is, not just fibromyalgia but also pain in her hands, kidney pain, incontinence, and obesity. She explains that the ALJ was required to consider all of these impairments in her RFC, and in particular how they affected her ability to do her past relevant work on a function-by-function basis—including the extensive typing and writing that her clerical jobs required.

An ALJ must consider the combined effects of all of the claimant's impairments, even those that would not be considered severe in isolation. *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (citing 20 C.F.R. § 404.1523). And at step four the ALJ must determine whether a claimant can still perform specific, essential mental and physical functions of her past work despite impairments. *Smith v. Barnhart*, 388 F.3d 251, 252–53 (7th Cir. 2004). So if a job requires typing, the ALJ must decide whether the claimant can still type. *Id.*

But even if the ALJ did omit discussion of an impairment here, Devitt does not explain how such an omission might have changed the outcome. In fact, contrary to Devitt's arguments, the ALJ did discuss her kidney problems at length, and he also discredited complaints about pain in her hands (and elsewhere), basing that credibility determination on medical findings about her joints and grip strength, among other things. Any error the ALJ might have made by failing to address her ability to do the typing in her past work was at best harmless because the ALJ also found that Devitt was not disabled at step five since she could do a significant number of jobs near Milwaukee. Moreover, her height and weight suggest obesity, but she points to no evidence of consequential conditions or limitations. And because she testified that her incontinence was worse in 1998 when she was still working, it is hard to see how it later became disabling. Any flaw in the ALJ's opinion is minor, and does not undermine his reasons for not finding her disabled.

Last, Devitt contends that the ALJ erroneously rejected her treating doctors' opinions in favor of the SSA doctors' without assessing the character and duration of the doctor-patient relationship or how well-supported each opinion was. She insists that the ALJ should have accepted Dr. Watt's "opinion" that she could work only 20 hours per week and Dr. Rubin's opinion that she had moderate functional limitations regarding social interaction, complex instruction, and concentration, and marked limitations on timeliness and endurance. She also contends that the ALJ wrongly relied on SSA Dr. Wallskog's opinion that she was exaggerating symptoms because Dr. Wallskog did not mention "fibromyalgia."

Regulations require ALJs to evaluate medical opinions in light of the patient's relationship and length of treatment with the doctor, how well-supported and consistent the opinions are, specialization of the doctor, and other factors. 20 C.F.R. § 404.1527(d)(2). A treating doctor's views control if "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence." *Id.*; *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003); *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005). When a treating doctor's views do not meet this standard, however, the ALJ is free to credit conflicting views instead. As we have observed, "a claimant is not entitled to disability benefits simply because her physician states that she is

'disabled' or unable to work." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001).

The ALJ in this case discussed the medical evidence at length, reasoning that the reports of Devitt's doctors were not well-supported and that they were contradicted by substantial evidence in the record. For example, the ALJ properly rejected Dr. Rubin's RFC assessment as unsupported, contrary to the testimony of Dr. Hamsher, and inconsistent with the assessments of Dr. Ruppert and other SSA doctors. *See id.* The ALJ considered Dr. Hinkle's records and the report of Devitt's retained consultant, Dr. Masci, but he found both weakly supported, and was free to credit Dr. Wallskog's opinion instead. *See id.* And the ALJ decided that what Devitt calls Dr. Watt's "opinion" ("Pt is unable to work even 20 hours a week") was just a treatment note that reflected only what Devitt told him. The ALJ was free to give this note little weight as it does not explain how her conditions limited her to 20 hours' work, and it conflicts with reports of SSA examining and consulting doctors. *See id.*

Our review of the ALJ's decision is limited, and we uphold it so long as it is legally correct and supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389 (1971); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Both requirements are met here, and the judgment of the district court is therefore AFFIRMED.