**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-1565**

LISA DUNN,

                    Plaintiff - Appellant,

       v.

CAROLYN W. COLVIN, Acting Commissioner, Social Security
Administration,

                    Defendant - Appellee.

Appeal from the United States District Court for the Eastern
District of Virginia, at Richmond.   John A. Gibney, Jr.,
District Judge. (3:13-cv-00222-JAG)

Argued: March 25, 2015           Decided: June 1, 2015

Before MOTZ and GREGORY, Circuit Judges, and Mary G. LEWIS,
United States District Judge for the District of South Carolina,
sitting by designation.

Affirmed by unpublished opinion. Judge Lewis wrote the opinion,
in which Judge Motz and Judge Gregory joined.

**ARGUED:** Bruce Knight Billman, Fredericksburg, Virginia, for
Appellant.  Elizabeth Wu, OFFICE OF THE UNITED STATES ATTORNEY,
Richmond, Virginia, for Appellee.  **ON BRIEF:** Nora Koch, Acting
Regional Chief Counsel, Taryn Jasner, Supervisory Attorney,
Meriah Russell, Assistant Regional Counsel, Office of the
General Counsel, SOCIAL SECURITY ADMINISTRATION, Philadelphia,
Pennsylvania; Dana J. Boente, United States Attorney, OFFICE OF
THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

MARY GEIGER LEWIS, District Judge:

Lisa Dunn (Appellant) brought this action under 42 U.S.C. § 405(g) in the district court of the Eastern District of Virginia seeking judicial review of the final decision of the Commissioner of the Social Security Administration (Appellee) denying her application for disability insurance benefits (DIB). Appellant, a high school graduate, was born on May 19, 1973. She has previously worked as a waitress, para-educator, daycare worker, bookkeeper, and cashier. She alleged that she became disabled on May 1, 2007, based on rheumatoid arthritis, fibromyalgia, headaches, depression, and anxiety. As noted by Appellant at oral argument, however, this case is concerned only with her psychiatric problems.

The parties filed cross-motions for summary judgment, which were referred to the magistrate judge for a Report and Recommendation (Report). In the magistrate judge's Report, he suggested that the district court grant Appellee's motion for summary judgment and deny Appellant's motion for summary judgment. Appellant filed objections to the Report. The district court overruled the objections, adopted the Report, granted Appellee's motion for summary judgment, denied Appellant's motion for summary judgment, and affirmed Appellee's final decision denying Appellant's claim for DIB.

3

Appellant then timely filed her notice of appeal with this Court. We have jurisdiction to consider her appeal under 42 U.S.C. § 405(g) and 28 U.S.C. § 1291. Discerning no reversible error, we affirm.

## I.

In a Social Security case such as this, it is the plaintiff's duty to both produce evidence and prove that she is disabled under the Social Security Act, § 205(g), 42 U.S.C. § 405(g). See Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995). Our review of the decision of the Administrative Law Judge (ALJ) in an action involving disability benefits is quite limited. We must uphold the ALJ's factual findings if they are supported by substantial evidence and reached by applying the correct legal standard. Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted) (quotation marks omitted). It "consists of more than a mere scintilla of evidence but may be less than a preponderance." Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996).

When we review whether substantial evidence supports the findings of the ALJ, "we do not undertake to reweigh conflicting

4

evidence, make credibility determinations, or substitute our judgment for that of the [ALJ]." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (internal citations and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant . . . is disabled, the responsibility for that decision falls on [the ALJ]." Craig, 76 F.3d at 589. "[T]he substantial evidence standard 'presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988) (quoting Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984)) (internal citation omitted).

Consequently, it is beyond dispute that it is not the province of the courts to resolve factual matters in Social Security cases such as this de novo. "At the same time, they must not abdicate their traditional functions; they cannot escape their duty to scrutinize 'the record as a whole' to determine whether the conclusions reached are rational." Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964) (quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 490 (1951)).

II.

The Social Security Administration has established a five-step sequential evaluation process for determining if a person is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v) (2004). In relevant part, the Code of Federal Regulations provides:

> At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled....
>
> At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled....
>
> At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled....
>
> At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled....
>
> At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

Id.

The parties agree that: (1) Appellant is not currently engaged in any substantial gainful activity; (2) Appellant has

6

several medically determinable severe impairments, (3) Appellant's severe impairments do not meet or equal an impairment in any of Appellee's Listing of Impairments, and, (4) Appellant's impairments prevent her from returning to her past relevant work. They disagree, however, as to Appellant's residual functional capacity--key to determining whether she is able to do other work.

## III.

There are two issues presented by this appeal: (1) whether the ALJ was correct in his decision not to give the opinion of the treating physician controlling weight, and (2) whether, in making his credibility determination as to Appellant, the ALJ erred in his consideration of the conservative nature of Appellant's treatment and her non-compliance with taking her medications as prescribed. We will consider these issues in turn.

## A.

First, Appellant contends that the ALJ erred in assigning limited weight to the opinions of her treating physician, Dr. John Swing, and her treating psychiatric counselor, Betty Gosnell. We are unconvinced.

7

When evaluating medical opinions, the ALJ should consider "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." Johnson, 434 F.3d at 654.

An ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up "specious inconsistencies," Scivally v. Sullivan, 966 F.2d 1070, 1077 (7th Cir. 1992), or has failed to give a sufficient reason for the weight afforded a particular opinion, see 20 C.F.R. § 404.1527(d) (1998).

According to 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2), a treating source's opinion on issues of the nature and severity of the impairments will be given controlling weight when well supported by medically acceptable clinical and laboratory diagnostic techniques and when the opinion is consistent with the other substantial evidence in the record. Conversely, however, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001); see also Craig, 76 F.3d at 590 (finding that "if a physician's opinion in not supported by clinical evidence or if

8

it is inconsistent with other substantial evidence, it should be accorded significantly less weight").

Of course, a medical expert's opinion as to whether one is disabled is not dispositive; opinions as to disability are reserved for the ALJ and for the ALJ alone. See 20 C.F.R. § 404.1527(e)(1) (1998). Generally, the more the medical source presents relevant evidence to support his opinion, and the better that he explains it, the more weight his opinion is given. See 20 C.F.R. § 404.1527(d)(3) (1998). Additionally, the more consistent the opinion is with the record as a whole, the more weight the ALJ will give to it. See 20 C.F.R. § 404.1527(d)(4) (1998).

In rendering his decision on this issue, the ALJ considered the opinions of four medical sources: (1) John Swing, M.D.; (2) Betty Gosnell, L.P.C; (3) Martha Merrion, Ph.D.; and (4) Sandra Francis, Ph.D.

As the ALJ noted in his decision, Appellant came to Dr. Swing on March 7, 2007, "due to worsening depression and anxiety." J.A. 10.[*] "She complained of anhedonia, decreased motivation, and increased crying. On exam she had depressed

---

[*] Citations herein to "J.A." refer to the contents of the Joint Appendix filed by the parties in this appeal; and citations to "A.R." refer to the Social Security Administrative Record that Appellee filed with the district court.

mood and congruent affect." Id. "On April 4, 2007, she reported her medications were causing her to be jittery. She noted to continue to be anxious." Id.

Appellant came to Dr. Swing again on May 30, 2007, and "expressed . . . increased depression and sadness, and decreased sleep." Id. The next time Appellant saw Dr. Swing was on July 16, 2007, at which time "she expressed that she was going to get a new job, because her current job was causing too much stress. She was cooperative and talkative. She was noted to be fairly stable." Id.

In Dr. Swing's "Psychiatry Progress Note" on August 16, 2007, "he noted that her depression was largely under control, but her [anxiety] persisted. She reported that she was much better overall, and she was noted as to be calm." Id. He also noted that she had "no suicidal or homicidal ideation." Id. The ALJ noted that Appellant returned to Dr. Swing on November 13, 2007, at which time "[s]he reported feeling overwhelmed, depressed and anxious." Id. Thereafter, on December 4, 2007, "she complained of feeling 'discouraged.'" Id.

On January 10, 2008, the ALJ noted from Dr. Swing's records that Appellant "was pleasant, calm, and cooperative, with no suicidal or homicidal ideation. She was noted to be improving." Id. Appellant saw Dr. Swing again on March 3, 2008. "She reported anxiety due to her recent medical course, and was

10

striving for answers." Id. at 12. During Appellant's March 31, 2008, appointment with Dr. Swing, she "reported having tremors from the medications. She was anxious." Id.

During Appellant's June 10, 2008, appointment with Dr. Swing, he "noted that [Appellant's] mild anxiety persisted. He also marked that she had no homicidal or suicidal ideation." Id. at 13. Then, during Appellant's July 8, 2008, appointment with Dr. Swing, "she was reportedly calm with no homicidal or suicidal ideation." Id. Appellant saw Dr. Swing on October 20, 2008. Id. At that time, she "reported to Dr. Swing that she felt that she was doing okay. She reported some increased anxiety, and was taking extra Xanax during the day." Id.

Appellant returned to Dr. Swing on January 22, 2009. Id. at 14. "She was quiet and calm. She reported that she was not taking her full dosage of medication because she could not afford it, but believed she needed it. She was stable, with no suicidal or homicidal ideation." Id. at 14. During Appellant's appointment on April 16, 2009, "[s]he had no suicidal or homicidal ideation. Id. During Appellant's April 21, 2009, appointment, "she complained [of] depression and increased crying." Id. Appellant reported on May 14, 2009, that "she had not started a prescribed medication. There was no suicidal or homicidal ideation." Id. And then "[o]n June 18, 2009, she was mostly calm, but was slight[ly] anxious at times." Id.

11

According to the ALJ, in regards to Betty Gosnell, Appellant's counselor,

> Treatment notes from [Appellant's] counselor in 2009 reflect that [Appellant] was reporting generalized fatigue and pain, but her boyfriend was being a bit more attentive to her. She noted positive experience from the neurofeedback sessions and expressed this [at] each appointment. Treatment notes dated November 4, 2009[], reflect that [Appellant] was in good spirits, had a goal of cooking more healthy foods for her family, and she was cooking more from scratch to save money at the grocery store.

Id. at 15 (citations omitted). There appears to be no dispute as to the ALJ's finding on this issue and, thus, we need not discuss it here except to say that the ALJ's summarization of Gosnell's notes are in accord with our own review of the notes.

Dr. Swing completed a Mental Impairment Questionnaire on January 21, 2009, in which he checked "severe" as it relates to eleven of a list of twenty of Appellant's work-related abilities. A.R. 893-94; see also J.A. 18. "Severe indicates that the activity is totally precluded on a sustained basis and would result in failing after even short duration: 5-10 minutes." A.R. 893. Dr. Swing marked as severe the following work-related limitations: needing "special supervision," "work[ing] in coordination with or [in] proximity to others without being distracted," "mak[ing] simple work related decisions," "complet[ing] a normal workday and work week without interruptions from psychologically based symptoms and . . .

12

perform[ing] at a consistent pace without an unreasonable number and length of rests," "interact[ing] appropriately with the general public or customers," "accept[ing] instructions and responding appropriately to criticism from supervisors," "get[ting] along with co-workers or peers without distracting them or exhibiting behavioral extremes," "maintain[ing] socially appropriate behavior and . . . adher[ing] to basic standards of neatness and cleanliness," "respond[ing] appropriately to expected changes in the work setting," "set[ting] realistic goals or mak[ing] plans independently," and "travel[ing] in unfamiliar settings and us[ing] public transportation." A.R. 893-94. However, the ALJ was permitted to afford these opinions limited weight, to the extent that they are controverted by other medical evidence in the record. See Meyer v. Colvin, 754 F.3d 251, 256 (4th Cir. 2014).

Gosnell, who provided therapy for Appellant from June 27, 2007, until July 22, 2008, three to four times a month, completed a mental status evaluation on July 29, 2008, which the ALJ summarized as follows:

> Ms. Gosnell opined that she did not believe
> [Appellant] was able to maintain a job at the time
> she completed the mental status evaluation form.
> [On] January 5, 2009, Ms. Gosnell indicated that the
> [Appellant] had mild-to-moderate impairments in her
> ability to perform activities of daily living, and
> marked impairments in ability to maintain social
> relationships and in maintaining concentration,
> persistence, and pace. She opined that [Appellant]

13

had severe impairments in her ability to maintain attention and concentration for at least 2 straight hours; sustain an ordinary routine without supervision, to complete a normal workday without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rests; to respond appropriately to expected and unexpected changes in the work setting, and to travel in unfamiliar settings and use public transport. She opined that [Appellant] would have moderately severe limitations in her ability to set realistic goals, to accept instructions and respond appropriately to criticism from supervisors; to ask simple instructions or request assistance from supervisors; to work in coordination or proximity to others without being distracted; to make simple work decisions; and to understand, remember, and carry out detailed instructions. She indicated that the claimant would be moderately limited in her ability to remember locations and work-like procedures, to understand[,] remember, and carry [ ] out simple instructions, to interact appropriately with the general public, and to be aware of normal hazards and take necessary precautions.

J.A. 17. Having reviewed Gosnell's mental status evaluation for ourselves, we think that the ALJ has correctly summarized it, and there appears to be no argument to the contrary.

Dr. Merrion of the Virginia Department of Rehabilitative Services examined Appellant on February 26, 2009. A.R. 907. Dr. Merrion found Appellant "capable of doing simple and repetitive tasks consistently well if she were not as dependent as she is." Id. at 911. Dr. Merrion also stated that Appellant "could take supervision and follow directions[,] but supervisors would tend to be exasperated with her. . . . Working with too many coworkers or the public would tend to render her less

14

efficient. . . . [Appellant] has a mildly to moderately impaired ability to deal with the normal stressors and demands encountered in competitive employment." Id.

Dr. Francis, the last non-examining State Agency psychologist to review Appellant's records for Appellee prior to the hearing before the ALJ, concluded that, "[d]ue to her psychiatric impairments, [Appellant] is . . . limited to tasks that only require limited contact with the general public, involving simple, unskilled work tasks." J.A. 18. To be more specific, Dr. Francis stated that Appellant "is able to meet the basic demands of competitive work on a sustained basis despite the limitations stemming from her mental impairments. She is capable of simple routine work in a nonstressful environment with limited contact with the public and coworkers. A.R. 929.

Based upon all of the medical evidence, the ALJ gave the opinion of Dr. Francis "significant weight because [it was] consistent with objective findings made upon examination of [Appellant]." J.A. 18. Further, the ALJ "assigned limited weight to the opinions of Dr. Swing and Ms. Gosnell, [Appellant's] treating psychiatric sources, as they are inconsistent with their treatment notes contained throughout [Appellant's] medical records." Id. As to Dr. Merrion, the ALJ gave her opinion "greater but not controlling weight because she had the opportunity to examine [Appellant], but only saw her on

15

one occasion." Id. We are of the opinion that substantial evidence supports the ALJ's decision to assign the weight that he did to the various medical opinions.

We must defer to the ALJ's assignments of weight unless they are not supported by substantial evidence. Hancock, 667 F.3d at 472. Here, some of Dr. Swing's treatment notes suggest that Appellant experienced periods of improvement. For example, Dr. Swing wrote "[o]n January 10, 2008, [that Appellant] was pleasant, calm and cooperative, with no suicidal or homicidal ideation. She was noted to be improving." J.A. 10. And "[o]n June 18, 2009, she was mostly calm, but was slight[ly] anxious at times." Id. Simply stated, there is more than a "scintilla of evidence" in the record supporting the ALJ's conclusion that Dr. Swing's opinion is incongruent with both his own treatment notes and some of the other medical evidence in the record.

In the medical opinion that Gosnell presented to the ALJ, "Ms. Gosnell opined that she did not believe [Appellant] was able to maintain a job at the time she completed the mental status evaluation form" on July 29, 2008. Id. at 17. Under our deferential standard of review, there is enough evidence in the record to support the ALJ's decision to accord this opinion less weight.

During Appellant's October 5, 2007, appointment with Gosnell, she stated that she was "feeling better and more

16

energized." She also told Gosnell that she was "willing to try to venture out a bit and look for a job." A.R. 948. At Appellant's October 15, 2007, appointment, Gosnell wrote in her notes that Appellant "is excited about [a] possible job at Rite Aid. She is eager to be interviewed and feels that she has a good shot at it." Id.

Appellant also reported that "she is optimistic and upbeat in the face of financial and relationship problems. She is better to get out of the house and says that she believes that neurofeedback has been helpful." Id. At Appellant's October 19, 2007, session, she said that she was "doing pretty well but feeling achy. Her first interview went well." Id. "She has been able to drive to her appointments and tend to her families' needs. This energizes her." Id.

And, then on June 23, 2009, just weeks before Gosnell completed her mental evaluation for Appellant, she stated in her notes that Appellant reported that "[s]ummer is going pretty well." A.R. 957. "[Appellant] is enjoying the warmer weather and longer periods of daylight. She says that life does not seem as overwhelming in the summer time. She is getting more physical exercise than in cold weather." Id. Gosnell also noted that Appellant "reports that that helps quite a bit. Relationship is going okay right now although she struggles with his parents and his relationship with his mother." Id.

17

Thus, as with Dr. Swing's opinion, a reasonable mind might agree with the ALJ's finding that Gosnell's opinion does not comport with her own treatment notes or with other evidence in the record. We hold that the ALJ's decision to accord limited weight to Gosnell's and Swing's opinions is supported by substantial evidence.

B.

Second, Appellant argues that the ALJ erred in considering the conservative nature of Appellant's treatment and her non-compliance in determining whether she was credible. We are unpersuaded.

On this issue, the ALJ stated the following:

[Appellant's] testimony regarding her extreme symptoms and limitations is not credible. [Appellant] has not generally received the type of medical treatment one would expect for a totally disabled individual. Although [Appellant] has received treatment for the allegedly disabling impairments, that treatment has been essentially routine and conservative in nature. Further the record shows that [Appellant] has not been compliant with recommended treatment. Treatment notes from Dr. Swing indicate compliance issues with medications, where [Appellant] had failed to start medications as prescribed, or had self-discontinued medications. Treatment notes from [Appellant's] primary care physician, as recent as November 2010, also show [Appellant] having compliance issues [and] self-discontinuing medications. While [Appellant] complained of migraine headaches and rheumatoid arthritis, the record shows that these have been responsive to treatment, including medications and trigger point injections. [Appellant's] routine and

18

> conservative treatment and failure to comply with her
> treatment regimen diminishes her credibility
> regarding the frequency and severity of her symptoms,
> and the extent of her functional limitations.

J.A. 17 (internal citation omitted). As already noted, in reviewing whether substantial evidence supports the findings of the ALJ, "we do not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ]." Johnson, 434 F.3d at 653.

1.

Prior to the ALJ's consideration of Step Four of the five-step sequential evaluation, the ALJ must determine the plaintiff's Residual Functional Capacity (RFC). 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). Under SSR 83-10, one's RFC is

> [a] medical assessment of what an individual can do
> in a work setting in spite of the functional
> limitations and environmental restrictions imposed by
> all of his or her medically determinable
> impairment(s). RFC is the maximum degree to which
> the individual retains the capacity for sustained
> performance of the physical-mental requirements of
> jobs.

Id.

> In his decision, the ALJ stated that,

> [a]fter careful consideration of the entire record,
> [he found] that [Appellant] has the residual
> functional capacity to perform a full range of light
> work as defined in 20 C.F.R. 404.1567(b)[,] except
> she should [have] no greater than moderate exposure
> to hazards such as machinery and heights. She is
> limited to occasionally climbing ramps, stairs,

19

ladders, ropes and scaffolds. She can occasionally balance, stoop, kneel, crouch and crawl. She is capable of understanding, carrying out and remembering simple instructions in an unskilled position, with no greater than occasional contact of the general public.

J.A. 9

"[W]hether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Craig, 76 F.3d at 594 (citations omitted) (emphasis omitted). "At this stage of the inquiry, the pain claimed is not directly at issue; the focus is instead on establishing a determinable underlying impairment—a statutory requirement for entitlement to benefits—which could reasonably be expected to be the cause of the disabling pain asserted by the claimant." Id. Second, after the first inquiry is complete, the ALJ must evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work[.]" Id. at 585. "This evaluation must take into account not only the claimant's statements about her pain, but also 'all the available evidence,' including the claimant's medical history, medical signs, and laboratory findings, any objective medical evidence of pain (such as

20

evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.)." Id. The ALJ must also take into account "any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it[.]" Id.

"[T]here must be . . . a medical impairment . . . which, when considered with all the evidence . . . (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability." 42 U.S.C. § 423(d)(5)(A).

According to the ALJ, Appellant has the following severe impairments: rheumatoid arthritis, fibromyalgia, headaches, depression, and anxiety. J.A. 6. And, the ALJ found that Appellant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Appellant's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the . . . residual functional capacity assessment." J.A. 10. Further, as stated above, the ALJ avowed that "[Appellant] has not generally received the type of medical treatment one would expect for a

21

totally disabled individual.  Although [Appellant] has received treatment for the allegedly disabling impairments, that treatment has been essentially routine and conservative in nature."  J.A. 17.

In response to the ALJ's holding regarding the routine and conservative nature of Appellant's treatment, Appellant argues that "[t]he characterization of [Appellant's] psychiatric care as 'routine and conservative' is an incorrect legal standard of evaluation of credibility where the term is undefined in the regulations and record.  The term is idiosyncratic to the beliefs of any given decision maker."  Appellant's Br. 26 (emphasis omitted).  We disagree.

First, according to 20 C.F.R. § 404.1529(c)(3)(iv)-(v), in determining if someone is disabled, it is appropriate to consider such things as:

> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; [and]

> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms[.]

Id.  Therefore, inasmuch as the ALJ is allowed to consider the nature of Appellant's treatment in determining whether she is disabled, a reasonable mind might agree that the conservative nature of Appellant's treatment is an adequate basis to support

22

the ALJ's conclusion that Appellant's testimony of her disabling condition was incredible.  See Craig, 76 F.3d at 589.

Second, contrary to any suggestion otherwise, this Court has long held that it is appropriate for the ALJ to consider the conservative nature of a plaintiff's treatment -- among other factors -- in judging the credibility of the plaintiff.  As this Court held in Craig, "[a]lthough a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers[.]"  Craig, 76 F.3d at 595.  See also Gross v. Heckler, 785 F.2d 1163, 1165-66 (4th Cir. 1986) (finding the claimant's claim that he was disabled not credible when "[h]is arthritis responded to conservative treatment, and his stomach pains were relieved by antacids.  If a symptom can be reasonably controlled by medication or treatment, it is not disabling."); Shively v. Heckler, 739 F.2d 987, 990 (4th Cir. 1984) ("Claimant's allegations that he suffered such severe pain are not supported by x-rays or neurological findings.  He has never been hospitalized for his back pain or other ailments. At the prior supplemental hearing, claimant indicated that the

23

medication he was taking for pain was Extra Strength Tylenol and Extra Strength Excedrin, both nonprescription medicines. At the latest supplemental hearing, claimant testified that he was taking Nalfon, which the Physician's Desk Reference describes as an analgesia for treatment of mild to moderate pain, prescribed for relief from acute flairs of rheumatoid arthritis and osteoarthritis. The ALJ observed that stronger medications could have been prescribed.").

Third, in allowing the conservative nature of one's treatment as one of the factors a court may consider in determining a claimant's credibility, we are in accord with several other courts of appeals that have held the same. See, e.g., Smith v. Colvin, 756 F.3d 621, 626 (8th Cir. 2014) (noting with approval that the ALJ's credibility determination was based, in part, on finding that the plaintiff's treatment was "essentially routine and/or conservative in nature") (internal quotation marks omitted); Wall v. Astrue, 561 F.3d 1048, 1068–69 (10th Cir. 2009) (holding that a history of conservative medical treatment undermines allegations of disabling symptoms); Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) (stating that evidence of conservative treatment permits the ALJ to discount the claimant's testimony regarding the severity of an impairment); Sienkiewicz v. Barnhart, 409 F.3d 798, 804 (7th Cir. 2005) (noting with approval the ALJ's consideration of the

nature of plaintiff's treatment as having been "routine and conservative" in making his credibility decision) (internal quotation marks omitted); Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000) (same); Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir. 1996) (holding that a physician's conservative medical treatment for a particular condition tends to negate a claim of disability).

Fourth, and finally, as to Appellant's argument that "[t]he term [conservative treatment] is idiosyncratic to the beliefs of any given decision maker[,]" Appellant's Br. 26, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" Clarke, 843 F.2d at 272-73.

In reviewing Appellant's arguments, it appears that she may be missing the reason as to why it is proper for the ALJ to consider the conservative treatment of a claimant in making a credibility decision. It is as simple as this: if all that the claimant needs is conservative treatment, it is reasonable for an ALJ to find that the alleged disability is not as bad as the claimant says that it is. Put another way, when a claimant complains that her alleged disability is so bad that she is

25

unable to work in any job whatsoever, but the ALJ finds that the treatment was not as aggressive as one would reasonably think would be employed if the alleged disability were actually that severe, then it is reasonable for the ALJ to conclude that the conservative treatment bears on the claimant's credibility.

Of course, there may be any number of reasons for a physician to prescribe a "conservative" course of treatment, and it is for that reason that such treatment alone would not necessarily render a claimant ineligible for disability benefits. But we are not presented here with a situation in which there is any suggestion that Appellant required more aggressive treatment yet received conservative treatment for other reasons. From the record as detailed herein, it appears that the conservative nature of Appellant's treatment was sufficient to prevent her from being totally disabled. Because it is well established in this circuit that the ALJ can consider the conservative nature of a claimant's treatment in making a credibility determination, we hold that there is substantial evidence in the record to support the ALJ's decision to take the conservative nature of Appellant's treatment into consideration in finding her claim of total disability incredible.

Next, Appellant maintains that her "alleged non-compliance with prescribed medication regimens is an improper factor for evaluation of credibility in the absence of any connection to [Appellant's] credibility such as [Appellant] did not need the medication, was failing to take the medication in order to produce disability or was attempting to hide the non-compliance." Appellant's Br. 30. We disagree.

Under 20 C.F.R. § 404.1530,

> to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work . . . . If you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits. . . . We will consider your physical, mental, educational, and linguistic limitations (including any lack of facility with the English language) when determining if you have an acceptable reason for failure to follow prescribed treatment.

As the ALJ noted in his decision, according to Appellant's medical records, she had been non-compliant with her recommended treatment. J.A. 17. According to the ALJ's decision, "[t]reatment notes from Dr. Swing indicate compliance issues with medication, where [Appellant] had failed to start medications as prescribed, or had self-discontinued medications. Treatment notes from [Appellant's] primary care physician, as recent as November 2010, also show [Appellant] having compliant issues [and] self-discontinuing medications." Id.

27

Specifically, we note that, although Dr. Swing had earlier prescribed Abilify, during Appellant's November 19, 2007, appointment, Appellant confessed that she had not yet started taking the medication because she was "afraid of weight gain." A.R. 677. On October 20, 2008, Appellant told her doctor that she was not taking her medications as prescribed because she could not afford them. Id. at 978. Although noncompliance indicates a lack of credibility only where "there are no good reasons" for failing to follow treatment, SSR 96-7p, 1996 WL 374186 (July 2, 1996), there is nothing in the record as to whether Appellant made any attempt to obtain assistance in purchasing her prescription medications.

In Dr. Swing's notes from Appellant's May 14, 2009, appointment, id. at 975, he noted that she had failed to begin taking Wellbutrin, as directed during her April 21, 2009, appointment, id. at 976. During Appellant's November 4, 2010, appointment with Dr. Dana B. Brown, Appellant informed Dr. Brown that she had, on her own, discontinued taking Wellbutrin, id. at 1074, since her last visit on October 18, 2010. Although Dr. Brown had previously "started her on Provigil, . . . she was afraid of the medicines and never did start it." Id.

Appellant argues in her brief that she "never engaged in behavior which reflects poorly on her credibility when it comes to taking medications." Appellant's Br. 39. But based on this

28

record, the ALJ was free to conclude otherwise. That is, the ALJ could reasonably have determined that the severe symptoms Appellant described were inconsistent with her failure to fully comply with the treatment her physicians prescribed. Cf., Johnson, 434 F.3d at 658 (failure to seek care of a medical specialist undermined the credibility of claimant's testimony about her subjective assessments of her pain). And we may not "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the" ALJ. Craig, 76 F.3d at 589.

In any event, the ALJ did not deny Appellant benefits solely because of the evidence of her non-compliance. Rather, Appellant's non-compliance was merely one of a number of factors the ALJ considered in determining that Appellant's testimony about her symptoms was only partially credible. Because the ALJ's determination is supported by substantial record evidence, we cannot disturb it.

IV.

Certainly, the ALJ could have done a better job in explaining the bases for finding that Appellant is not disabled under the Act. But, the fact that the ALJ could have offered a more thorough explanation for his decision does not change our conclusion that substantial evidence in the record supports that

29

decision.  We hold that "the ALJ's factual findings . . . are supported by substantial evidence and [were] reached by applying the correct legal standard."  Hancock, 667 F.3d at 472.

V.

For these reasons, we affirm the judgment of the district court.

AFFIRMED